[Crim. No. 6623. First Dist., Div. One. June 12, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM WALTER ASHER et al., Defendants and Appellants.

882

Gordon L. Graham and Kerry M. Gough, under appointments by the Court of Appeal, and Bonjour & Gough for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Robert R. Granucci and John T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

SIMS, J.—William Walter Asher, Victor Franklin Carrafa and William Henry Williams have each appealed from separate judgments of conviction of murder of the first degree, sentencing them to state prison, with varying prior convictions. The judgments were entered after a bifurcated jury trial in which the jury found each defendant guilty of the murder in the first degree of John Kammeyer on December 8, 1960, and fixed the penalty at life imprisonment.

The uncontradicted evidence shows that Kammeyer, the manager of a bar, was fatally shot by Williams, and that the three defendants robbed the bar and its patrons. The evidence was conflicting as to whether the intent to rob the establishment was formulated before or after the shooting. Evidence also was introduced to show that Williams was incapable of harboring malice aforethought or the intent to kill or rob because of mental disease, defect and intoxication. Insofar as is material the evidence on these issues is referred to below.

Each of the defendants contends (1) that the evidence is insufficient to sustain the verdicts and judgments, (2) that the court erred in failing to give instructions on manslaughter, and (3) that the court erred in failing to submit separately to the jury the question of whether any defendant could be found guilty of robbery as a lesser included offense. (4) Carrafa and Williams additionally claim that the court's

instructions on the effect of intoxication were erroneous, and (5) that the court erred in admitting evidence of their commission of an earlier offense. (6) Carrafa and Asher each assert error in the findings concerning their respective prior convictions, and (7) Asher complains of irregularities in connection with the hearing and denial of his motion for a new trial.

An examination of these contentions reveals that with the exception of an error in the designation of a prior conviction found to have been suffered by Asher, there is no prejudicial error in the record, and the judgments must be affirmed with the exception of the finding that Asher suffered a prior felony conviction.

*Sufficiency of the Evidence*

■ "Under the felony-murder rule of section 189 of the Penal Code, a killing committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under section 288 is murder of the first degree. This is true whether the killing is wilful, deliberate, and premeditated or merely accidental and whether or not the killing is planned as a part of the commission of the robbery. [Citations.]" (*People v. Lookadoo* (1967) 66 Cal.2d 307, 314 [57 Cal.Rptr. 608, 425 P.2d 208]. See also *People v. Willingham* (1969) 271 Cal.App.2d 562, 575 [76 Cal.Rptr. 760]; *People v. Baglin* (1969) 271 Cal.App.2d 411, 416 [76 Cal.Rptr. 863]; *People v. Lilliock* (1968) 265 Cal.App.2d 419, 431 [71 Cal.Rptr. 434]; *People v. Chapman* (1968) 261 Cal. App.2d 149, 165 [67 Cal.Rptr. 601]; *People v. Fortman* (1967) 257 Cal.App.2d 45, 51 and 55 [64 Cal.Rptr. 669]; and *People v. Sievers* (1967) 255 Cal.App.2d 34, 38-39 [62 Cal.Rptr. 841].)

The testimony shows that the defendants entered the bar about 7 or 7:30 p.m. and first occupied and thereafter spent most of their time in the vicinity of three bar stools at the far end of the bar, away from the entrance and near the rest rooms and rear office. They drank, conversed with other patrons in the bar, moved about the bar, occasionally left the premises and returned, displayed large amounts of cash in big denominations, and shook dice for drinks and music. They ordered mixed drinks, and notwithstanding the duration of their stay, none of them appeared to be intoxicated. The bartender noticed that they appeared nervous. He thought they might do something, and called a friend to come over.

The manager and the owner, who had left the bar together earlier in the evening, returned around 10:30 p.m. or sometime earlier. At the bartender's request Kammeyer went to the safe in the back office and got some change. After this transaction had been completed one of the defendants asked him if he wanted to shake dice for $100. Kammeyer declined saying he only had $20 of his own money. The bartender heard the manager call the defendants "punks" or "bums" when he was urged to roll the dice. Kammeyer also got into an argument with a patron about a loan. During this altercation the defendants impliedly advised the bartender that they would assist him if he needed help in quieting the altercation. According to the bartender, by 11 o'clock things had quieted down and there was no contact between Kammeyer and any of the defendants after the earlier incident.

At almost the stroke of midnight the defendants opened their coats and withdrew weapons. Williams had a sawed-off shotgun which a patron recognized as a 12-gauge single barrel weapon. Asher and Carrafa had pistols. Williams said, "This is a holdup. Don't make a move, and don't anybody do anything wrong. Put your hands on top of the bar." Williams walked up to Kammeyer saying, "I'll show you who to call a punk." He put the shotgun in Kammeyer's back, pressed the trigger and the weapon discharged. Kammeyer fell, mortally wounded.

The bartender heard Williams threaten to do the same to anyone who interfered "because you only die once." Then, apparently to the dying Kammeyer, Williams said, "You didn't know who you were fooling with, Baby."

The owner moved to help Kammeyer but Williams told her to get back. A voice said, "What did you do that for?" Two patrons thought they heard the owner and the bartender say these words. The bartender thought they came from Carrafa. Williams replied, "I'm going to pay for this." The defendants each cautioned the patrons, "Everybody keep still. Nobody else will get shot."

The bartender and the owner heard the announced holdup before Williams shot Kammeyer. Other patrons who testified were apparently unaware of what was happening until their thoughts or conversations were interrupted by the blast of the shotgun.

Kammeyer was moaning, "I'm dying; I'm dying; I've been shot." Williams demanded money from the bartender who complied by giving him bills and checks worth about $418. Williams then directed either Asher or Carrafa to

empty the cash register of the change. Williams reloaded the shotgun and took a position guarding the entrance door. The bartender asked him if he wanted the front door closed and Williams replied, "No; leave the door open. We want the business operating as normal."

Carrafa, gun in hand, emptied the cash register. Carrafa or Asher .then said, "Let's get that safe open." Williams told the bartender that he picked "The New Hearth" for the robbery because they had been there on Friday night and had seen the receipts, which they thought by Sunday would total some $1,200-$1,500.

Asher, armed with a pistol, pulled the owner back toward the office where the safe was located. She did not have a key to the office door and Asher broke down the door. Asher said that they expected to find $2,000 in the safe. The owner explained that she did not know how to open the safe. She. tried to open it while Asher and Carrafa moved in and out of the office. Both also worked on the safe.

About five minutes later, Asher and Carrafa came out and dragged the bleeding and moaning Kammeyer into the office. As they did so they abused him. Asher kicked him in the ribs; Carrafa kicked him in the stomach. Inside the office Kammeyer, barely conscious, tried to give them the combination. He was kicked and shoved. The bartender went in and offered to help. Kammeyer gave numbers but the bartender could not get the safe open. The owner pleaded that Kammeyer was bleeding to death. Asher replied, "I know. That punk is trigger-happy. He's going to be sorry he did this." Picking up some rubber gloves, he wiped off the safe and the combination dial.

During and after the attempt to open the safe the patrons in the bar were systematically robbed. Williams continued to guard the door and had also armed himself with a "cutting knife." The bartender told Williams that the police often came in and Williams replied, "From where I am standing I will blow a hole in their back[s]. They won't have half a chance. I hope they do come in." A patron heard him express the same hope, adding, "I would just like to smoke me one of them." The same patron fearing that Williams would shoot the first person to enter, exclaimed that a friend was due to arrive. Asher, pointing a gun at the patron's head, came up and hit him over the head, knocking him off the bar stool.

At about 12:15 a lady called the bartender and Williams answered the telephone. Williams told her that the bartender

had gone out for a sandwich. About 15 minutes later she entered the bar only to be grabbed by Williams. The bartender yelled, "That is my wife." Asher, coming out of the rear office, told Williams to leave her alone.

A patron stepped in at about 12:30 a.m. and he also was jumped by Williams. He was told to put his wallet on the bar "or you're dead." Asher, holding a gun, came up and kicked him in the groin. A second customer who came in at 12:45 a.m. to keep his appointment with a patron, received similar treatment.

Williams ordered the bartender to mix drinks for the customers which was done. Later Carrafa told the bartender to wash all the glasses. Then the bartender was directed to break all the glasses which he and the defendants proceeded to do. The defendants, of course, had been handling glasses during the evening. The telephones were ripped out of the bar and the back office.

The defendants left about 1 a.m. Williams warned the victims not to call for help, "We'll have a man with a 30-30 Savage waiting across the street covering the door." One of the defendants said, "Just tell them [the police] three niggers held us up."

█ There is no lack of substantial evidence to sustain the charge. (See *People* v. *Teale* (1965) 63 Cal.2d 178, 187 [45 Cal.Rptr. 729, 404 P.2d 209] [reversed on other grounds *Chapman* v. *California* (1966) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]]; *People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v *Baker* (1954) 42 Cal.2d 550, 563 [268 P.2d 705]; *People* v. *Willingham, supra,* 271 Cal.App.2d 562, 570-571; *People* v. *Chapman, supra,* 261 Cal.App.2d 149, 160-161; and *People* v. *Fortman, supra,* 257 Cal.App.2d 45, 52.)

Defendants' attack is predicated on the premise that the evidence compels the conclusion that the killing arose solely out of Williams' mental illness, intoxication, use of drugs and passion and anger at being called a "punk" by the victim. If such were the case and the killing preceded, or was not in furtherance of the robbery, the felony-murder rule would not be applicable to Williams.

In *People* v. *Washington* (1965) 62 Cal.2d 777 [44 Cal. Rptr. 442, 402 P.2d 130], the opinion observed and ruled, "The felony-murder rule has been criticized on the grounds that in almost all cases in which it is applied it is unnecessary and that it erodes the relation between criminal liability and moral culpability. [Citations.] Although it is the law in this

state (Pen. Code, § 189), it should not be extended beyond any rational function that it is designed to serve. Accordingly, for a defendant to be guilty of murder under the felony-murder rule the act of killing must be committed by the defendant or by his accomplice acting in furtherance of their common design. [Citations.]'' (62 Cal.2d at p. 783.) In *People* v. *Schader* (1965) 62 Cal.2d 716 [44 Cal.Rptr. 193, 401 P.2d 665] the court hypothesized, ''If Schader did not know that the robbery had occurred or that the police officer was seeking to apprehend either Turner or himself for a robbery, Schader at the time of the killing was not perpetrating or attempting to perpetrate a robbery. If such were the case, it is immaterial, insofar as the felony-murder doctrine is concerned, that Turner had just committed a robbery for which Schader would be liable as a coconspirator or that Schader would also have been guilty of first degree murder if Turner had killed in the commission of the robbery.

''If Schader's testimony is believed, the killing he committed had no relationship to the planned robbery except that it occurred during the time of the conspiracy's existence. The killing was not committed in the perpetration of the robbery, just as it would not have been so committed if Schader had killed at a different time and place accidentally or for a purpose personal to himself while, unknown to him, a coconspirator was engaged in a previously planned robbery.'' (62 Cal.2d at pp. 731-732. See also *People* v. *Ford* (1966) 65 Cal.2d 41, 55-57 [52 Cal.Rptr. 228, 416 P.2d 132]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 705 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Jeter* (1964) 60 Cal.2d 671, 675 [36 Cal.Rptr. 323, 388 P.2d 355]; and *People* v. *Carnine* (1953) 41 Cal.2d 384, 388 [260 P.2d 16].)

By the same token, if the killing were not in furtherance of the robbery, the defendants Asher and Carrafa cannot be charged vicariously as accomplices. In *People* v. *Gilbert, supra,* 63 Cal.2d 690, the following principles are found among those that may be invoked to convict a defendant of first degree murder for a killing committed by another. '' (3) *Vicarious criminal liability.* Under the rules defining principals and criminal conspiracies, the defendant may be guilty of murder for a killing attributable to the act of his accomplice. To be so guilty, however, the accomplice must cause the death of another human being by an act committed in furtherance of the common design. (*People* v. *Schader,* 62 Cal.2d 716, 731 . . . ; *People* v. *Boss,* 210 Cal. 245, 249 . . . ; *People* v. *Ferlin,* 203 Cal. 587, 597 . . .)

"(4) *The application of Penal Code section 189.* When murder is established under Penal Code sections 187 and 188 pursuant to the principles defined above, section 189 may properly be invoked to determine the degree of that murder. Thus, even though malice aforethought may not be implied under section 189 to make a killing murder unless the defendant or his accomplice commits the killing in the perpetration of an inherently dangerous felony *(People* v. *Washington,* 62 Cal.2d 777, 780-783 . . . ; *People* v. *Ford,* 60 Cal.2d 772, 795 . . .), when a murder is otherwise established, section 189 may be invoked to determine its degree." (63 Cal.2d at p. 705. In addition to cases cited, see *People* v. *Jeter, supra,* 60 Cal.2d at p. 676.)

Asher and Carrafa each testified that there was no plan or intent to rob the bar; that Williams shot Kammeyer as a result of an altercation; and that each only joined in the robbery because of fear of Williams. They revealed that Asher's girl friend, a minor, had been left in their car in a parking lot during the entire evening. Williams did not remember taking the shotgun into "The New Hearth," but did recollect being served, to his dissatisfaction, strong drinks in the bar. When the "explosion" occurred he discovered the shotgun in his hands. He did not remember anything else that happened.[1] On cross-examination, he admitted a prior felony conviction.

In addition to the evidence which has been summarized above concerning the epithet directed at Williams or at the defendants collectively by Kammeyer, the defendants rely upon testimony concerning Williams' past history, and expert testimony concerning his mental state. They point to evidence which indicates that Williams was an alcoholic, suffering from sclerosis of the liver, that prior to going to the bar on the day of the killing, Williams had eaten nothing and had been drinking throughout the day, that arriving at the bar, he drank steadily for a period of some five hours and may have consumed as many as three to six drinks per hour, and that he was mentally ill, a sociopath, that he directed his rage and hostility toward persons of authority, that to Williams, the victim, a bar manager, represented a person of authority.

Doctors David R. Kessler, James Mickles, Roland Levy, and Henry R. Werdegar, psychiatrists, examined appellant Wil-

---

[1] At the penalty phase, Williams testified that he remembered everything that happened in the bar that night.

liams in April and May 1967. Each doctor spent between one and two hours with defendant.

The testimony of Dr. Werdegar indicated that Williams harbored neither malice aforethought nor intent to kill or rob. The doctor testified that appellant could not consider, reflect, or weigh the rightness or wrongness, advantages or disadvantages, implications or consequences of his actions. As a result of mental illness, he suffered a severely handicapped capacity to premeditate or to form any reasoned intent to commit any complex act. He lacked substantial capacity to form intent to commit murder or robbery. Dr. Werdegar also testified that the defendant shot Kammeyer because Kammeyer represented an authority figure who had provoked him, and that the shooting was not in furtherance of the robbery.

Dr. Mickle testified that while defendant could have carried on purposeful conduct at the time of the robbery the shooting was the acting out of a behavioral pattern, rather than an act done as part of a robbery. Williams' rages and hostilities were usually directed toward persons in positions of authority; the bartender, bar manager (the victim) the bar owner represented persons of authority to him; and the shooting of such an individual would be consistent with defendant's pattern of expressing his hostility to persons in authority. Further, Williams was suffering from a severe sociopathic personality disorder.

Dr. Levy testified that Williams suffered from a sociopathic personality disorder and acted before he thought, and that his use of alcohol and drugs would further aggravate his violent tendencies and impair even further his rather poor controls. While defendant did have the ability to form specific intent to steal, the shooting occurred not as part of a robbery scheme but rather as the result of the earlier altercation between Williams and the victim.

Dr. Kessler testified that Williams' ability to conform his actions to law-abiding behavior was likely to have been impaired by his intoxication. While Williams could have had intent to rob, it is entirely speculative as to whether he did have such intent.

Dr. Walter Rapaport, a psychiatrist, reviewed the reports of Doctors Levy, Mickles and Werdegar, as well as the grand jury transcript. He further reviewed the transcribed testimony of the aforementioned doctors and that of Dr. Kessler. He did not examine Williams. He reached the opinion that

Williams did have the mental capacity to form an intent to rob.

Defendants contend that the conclusion they urge is also supported by the testimony of three witnesses who, in contrast to the bartender and owner, did not hear any mention of a holdup until after the shot. It is equally probable that these patrons were engrossed in their own affairs until startled by the shot. They allege that the killing of the only person who could open the safe could not be in furtherance of the robbery. However, there is nothing to indicate that any of the defendants knew that the manager was the only one who had the combination to the safe. They also point out that the remark attributed to Williams by the bartender, "I'll show you who to call a punk," supports the views of their experts.

The court instructed the jury fully concerning the prosecution's burden to establish that the killing was in furtherance of a conspiracy to rob within the principles enunciated in the cases cited above.[2] The court's instructions concerning diminished capacity are discussed below.

The evidence upon which the defendants rely merely

---

[2] Among these instructions are the following: "In order to convict any defendant of first degree murder in the perpetration of a robbery you must be convinced beyond a reasonable doubt that at or before the time of the shooting such defendant had a specific intent to commit a robbery.

"You may not find the Defendants Carrafa and Asher guilty of murder in the first degree unless you are first satisfied beyond a reasonable doubt and to a moral certainty that Defendant William Williams killed John Kammeyer in the course of and in furtherance of a robbery, and that Defendants Victor Carrafa and William Asher either conspired to rob or aided, abetted or participated in the robbery prior to the time the fatal shot was fired.

"If you find that Defendant Williams had not formed an intention to commit robbery until after he shot John Kammayer, then you are instructed that John Kammeyer was not killed by Williams in the perpetration or attempt to perpetrate the crime of robbery.

"A person who joins a conspiracy to rob, or who aids and abets a robbery already in progress, is not liable or bound by acts of the co-conspirators or for any murder committed by a co-conspirator before such person so joins.

"Where a robbery conspirator commits an act which is neither in furtherance of the object of the robbery nor the natural and probable consequence of an attempt to attain that object, he alone is responsible for and is bound by that act, and no responsibility therefor attaches to any confederate or confederates. . . .

"Now, you may not find the Defendants Asher and Carrafa guilty of murder unless you first find the Defendant Williams guilty of murder in the first degree, which you find to be a killing in the course of and in the furtherance of the perpetration or attempt to perpetrate a robbery. You may not find Asher and Carrafa guilty of murder if you find that Defendant Williams is guilty of murder in the second degree, or if you find Williams guilty of murder in the first degree, but not in the course of and in furtherance of the perpetration or attempt to perpetrate a robbery."

created a conflict which the jury resolved under proper instructions. The joint action of the defendants at the time of the shooting, and their subsequent conduct were circumstances from which the jury could infer a planned conspiracy to rob the bar and its patrons. The testimony concerning the acts of Williams before and after the shooting contradicted his testimony of a blackout. The inane shooting of Kammeyer was not necessarily completely detached from the robbery. As noted in *People v. Schader, supra,* "the fact that the killing occurred in such close proximity in time and space to the robbery casts doubts on the truth of Schader's testimony that they were unrelated." (62 Cal.2d at p. 732.) It was a gruesome example to the others present of the consequences that would result from noncooperation. The fact that Williams acted from pique in selecting a victim does not lessen the responsibility of his accomplices if the shooting was also motivated by an intent to further the robbery. ■ Even if Asher and Carrafa (although armed themselves) did not intend that life should be taken in the perpetration of the robbery, or forbade Williams to kill, or regretted his acts, they cannot relieve themselves of responsibility for the homicide committed by their associate in furtherance of the common purpose to rob. (*People v. Lawrence* (1904) 143 Cal. 148, 157 [76 P. 893, 68 L.R.A. 193].)

■ "It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. ■ If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment. (*People v. Love,* 53 Cal.2d 843, 850 . . . ; *People v. Newland,* 15 Cal.2d 678, 680 . . . ; *People v. Daugherty,* 40 Cal.2d 876, 885 . . .)" (*People v. Robillard, supra,* 55 Cal.2d 88, 93. See also *People v. Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal. Rptr. 30, 401 P.2d 382] ; *People v. Lawrence, supra,* 143 Cal. 148, 154; *People v. Chapman, supra,* 261 Cal.App.2d 149, 161; and *People v. Fortman, supra,* 257 Cal.App.2d 45, 52.)

Defendants' attack on the sufficiency of the evidence cannot be sustained.

*Instructions on Manslaughter*

In instructing the jury the court defined "homicide" (see CALJIC (1967 Cum. Pocket Part) No. 300 (New)), first and second degree murder as set forth in section 189 of the Penal

Code, with the deletion of reference to felonies other than robbery (see CALJIC (rev. ed. 1958) No. 302-A), robbery (see *id.* No. 210), the intent and asportation necessary for the theft included in robbery (see *id.*, Nos. 221 and 222), and conspiracy (see *op.cit.* (1967 Cum. Pocket Part) No. 931 (Rev.)). An instruction similar to those found in CALJIC was given concerning the responsibility of one confederate for a murder committed by another (cf. (rev. ed. 1958) No. 317 and No. 317A). The jurors' attention was again directed to the requirement of a specific intent to permanently deprive the owner of his property as an element of the crime of robbery, or the crime of murder committed in the perpetration or attempt to perpetrate robbery (cf. Committee on CALJIC 11/14/68, No. 210 (Rev.)). An instruction was given on the sufficiency of circumstantial evidence to prove the intent to rob. This instruction contained an admonition that the acting defendant had to have the specific intent to rob prior to the firing of the fatal shot (cf. *op.cit.* (1967 Cum. Pocket Part) No. 27-A (New)). A further instruction predicated on CALJIC No. 26 (Rev.) (1967 Cum. Pocket Part) correctly instructed the jury on the requirements of proof by circumstantial evidence of the issues of intent to rob and the entry into a prior conspiracy to rob. On behalf of Asher and Carrafa an instruction was given on the effect of threats and menace in connection with their aiding or abetting the robbery (cf. *id.*, No. 71-F (Rev.)). There followed the instructions referred to above. (See fn. 2, *supra.*)

Having so charged the jury with respect to the felony-murder and conspiracy theories, the court gave further instructions on homicide which it designated as applicable to Williams. One instruction was given on diminished capacity to form the requisite intent for robbery,[3] and one on diminished capacity to premeditate or harbor malice.[4] An instruc-

---

[3]". . . you must first determine if Williams had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, and consider what effect, if any, this diminished capacity had on the defendant's ability to form the specific intent to rob and permanently deprive another of his personal property."

[4]"'If you find from the evidence that at the time that the alleged crime was committed—that is, the murder—Williams had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on Williams' ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that Williams' mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and pre-

tion to resolve any doubt as to the degree in favor of the lesser degree (see CALJIC (1958 rev. ed. ) No. 305-A) was followed by instructions reiterating the necessity for the capacity to form the specific intent to rob, and the requirement that killing be in the perpetration, furtherance or cause of the robbery. The jurors' attention was directed to an alternative theory of a wilful, deliberate and premeditated killing, and instructions were given defining murder and malice (id., No. 301 (Rev.)), and premeditation (id., No. 303 (Rev.)). An instruction on murder of the second degree (id., No. 305 (Rev.); cf. Committee on CALJIC 12/27/68, No. 305 (Re-revised), 305.01 (New), and, particularly 305.02 (New)) set forth as a third type of murder of the second degree (felony-second degree murder), "when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life, such as the possession of a firearm by a person who has been convicted of a felony, which is expressly prohibited by Section 12012 of the Penal Code."[5]

The foregoing instructions were followed by an instruction on intoxication in the language of section 22 of the Penal Code, and the jurors were expressly admonished to consider the evidence of intoxication on the issue of intent.[6] The court continued by substantially repeating the final sentence of the

---

meditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of the first degree.'' (Cf. CALJIC (1967 Cum. Pocket Part) No. 305.1 (New) which concludes with the words ''guilty of murder of *either* the first *or second degree.''* (Italics added.).)

[5] In *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] the court limited the scope of the second degree felony-murder doctrine as set forth in CALJIC No. 305 (Rev.) as follows: ''We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged.'' (70 Cal.2d 539, as modified, fn. omitted; and see *People* v. *Fain* (1969) 70 Cal.2d 588, 598 [75 Cal.Rptr. 633, 451 P.2d 65], as modified.) No attempt is made to determine whether a violation of Penal Code section 12021 falls within the above proscription, or the principles upon which it was based. For the reasons set forth below in connection with the manslaughter instructions, there could be no prejudice to Williams or his codefendant because of a failure to correctly define second degree murder.

[6] This instruction read: ''If and when the proof shows that the defendant unlawfully killed a human being, and if the evidence also shows that at the time of the mortal assault the defendant was intoxicated, the jury is permitted and ought to consider such evidence of intoxication for the purpose of determining the intent with which the act was done.''

instruction it had already given on diminished capacity (see fn. 4, *supra*), and setting forth again the requirements of premeditated murder of the first degree. It then repeated at length the instruction it had given on diminished capacity with respect to non-felony murder (see fn. 4, *supra*), and followed it with a second instruction on the effect of diminished capacity on the "ability to form the specific mental state that is an essential element of robbery."

Defendant Williams offered instructions which defined manslaughter,[7] voluntary manslaughter,[8] and which directed the jury to find manslaughter rather than murder in the event of a reasonable doubt as to whether an established homicide was murder or manslaughter.[9] These instructions were rejected by the court.

In *People* v. *Carmen* (1951) 36 Cal.2d 768 [228 P.2d 281], the opinion adopted with approval the following passage from *People* v. *Burns* (1948) 88 Cal.App.2d 867, 871 [200 P.2d 134] : "It is elementary that the court should instruct the jury upon every material question upon which there is any evidence deserving of any consideration whatever. [Citations.] The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon. [Citations.] That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true. [Citations.]" (36 Cal.2d at p. 773. See also, *People* v. *Castillo* (1969) 70 Cal.2d 264, 270-271 [74 Cal.Rptr. 385, 449 P.2d 449]; *People* v. *Wilson* (1967) 66 Cal.2d 749, 759 and 762-763 [59 Cal.Rptr. 156, 427 P.2d 820]; *People* v. *Conley* (1966) 64 Cal.2d 310, 319 [49 Cal.Rptr. 815, 411 P.2d 911]; *People* v. *Schader, supra,* 62 Cal.2d 716, 731-732; *People* v. *Jeter, supra,* 60 Cal.2d 671, 674; *People* v. *Modesto* (1963) 59 Cal.2d 722, 729 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Miller* (1962)

---

[7]"Manslaughter is the unlawful killing of a human being without malice aforethought. It is not divided into degrees but is of two kinds, namely, voluntary manslaughter and involuntary manslaughter." (CALJIC (1967 Cum. Pocket Part) No. 308 (Rev.).)

[8]"Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought upon a sudden quarrel or heat of passion without deliberation or premeditation." (CALJIC (1967 Cum. Pocket Part) No. 308-A (Rev.).)

[9]"If you are satisfied beyond a reasonable doubt that the killing was unlawful, but you have a reasonable doubt whether the crime is murder or manslaughter, you must give the defendant the benefit of such doubt and find it to be manslaughter rather than murder." (CALJIC (1967 Cum. Pocket Part) No. 305-AA (New).)

57 Cal.2d 821, 829-830 [22 Cal.Rptr. 465, 372 P.2d 397]; *People v. Baker* (1954) 42 Cal.2d 550, 576 [268 P.2d 705]; *People v. Ray* (1967) 252 Cal.App.2d 932, 967-971 [61 Cal.Rptr. 1] (cert. denied (1968) 393 U.S. 864 [21 L.Ed.2d 132, 89 S.Ct. 145]); *People v. Hudgins* (1967) 252 Cal.App.2d 174, 179-181 [60 Cal.Rptr. 176] (cert. denied (1968) 390 U.S. 965 [19 L.Ed.2d 1167, 88 S.Ct. 1073]); and see Pen. Code, § 1093, subd. 6.)

 Williams claims that the failure to give his proffered instructions on manslaughter violated the foregoing principle and constitutes prejudicial error requiring a reversal. Asher and Carrafa assert that any error by which the jury was prevented from finding Williams guilty of a lesser offense taints the vicarious criminal liability which was imposed on them. (See *People v. Schader, supra,* 62 Cal.2d 716, 732; and *People v. Jeter, supra,* 60 Cal.2d 671, 676.)

In *People v. Jeter, supra,* as in this case, the perpetrator of the homicide and his companion fled with property of the victim. In fact, their convictions of robbery were affirmed. There was, however, a conflict in the evidence as to whether the fatal shot was fired during the perpetration of a robbery, or as a result of a scuffle arising out of an argument. The court observed, "The crime, if any, could have been second degree murder if the jury found that Jeter fired the first shot with malice aforethought but without wilfulness, deliberation, or premeditation [citations], or it could have been manslaughter if the jury found that the shooting was done without malice upon a sudden quarrel or in the heat of passion. [Citations.]" (60 Cal.2d at p. 675.) The court ruled, ". . . the issues of second degree murder and manslaughter are squarely posed, and it was prejudicial error not to instruct thereon." (*Id.,* p. 676. See also *People v. Carmen, supra,* 36 Cal.2d 768, 773-774; and cf. *People v. Hudgins, supra,* 252 Cal.App.2d 174, 181.)

 It is questionable whether the evidence in this case would support a finding that the homicide was committed "upon a sudden quarrel or heat of passion." (See Pen. Code, § 192, subd. 1.) The evidence concerning the time which elapsed between Kammeyer's remark to Williams and his companions, and the fatal shooting is conflicting. Nevertheless, both men had returned to their respective stools at opposite ends of the bar, and no scuffle ensued. The subsequent shooting was entirely without warning, and ostensibly deliberate. On these circumstances alone, it was proper to refuse an

instruction on ordinary manslaughter. (*People* v. *Hudgins, supra,* 252 Cal.App.2d at p. 181.)

▉ The defendants do not seriously contend that the homicide falls within the definition of manslaughter in the proffered.instructions. They urge that the issue raised by the evidence of Williams' diminished capacity necessitated further instructions on manslaughter. In *People* v. *Aubrey* (1967) 253 Cal.App.2d 912 [61 Cal.Rptr. 772], the court observed, ''What the *Conley* opinion [*People* v. *Conley* (1966) 64 Cal. 2d 310 (49 Cal.Rptr. 815, 411 P.2d 911)] teaches is that there is a type of voluntary manslaughter which does not come within any of the three definitions found in Penal Code section 192. . . . The nonstatutory voluntary manslaughter is a homicide which may be intentional, voluntary, deliberate, premeditated, and unprovoked. It differs from murder in that the element of malice has been rebutted by a showing that the defendant's mental capacity was reduced by mental illness, mental defect or intoxication.'' (253 Cal.App.2d at p. 919, quoted with approval in *People* v. *Castillo, supra,* 70 Cal.2d at p. 270. See also, *People* v. *Conley, supra,* 64 Cal.2d at p. 318; *People* v. *Gorshen* (1959) 51 Cal.2d 716, 733-734 [336 P.2d 492]; *People* v. *Baker, supra,* 42 Cal.2d 550, 569; *People* v. *Conley* (1968) 268 Cal.App.2d 47, 51-52 [73 Cal.Rptr. 673]; and *People* v. *Waters* (1968) 266 Cal.App.2d 116, 120-122 [71 Cal.Rptr. 863].)

▉ The failure of a defendant to request an instruction on the type of voluntary manslaughter which has been developed out of the doctrine of diminished capacity will not relieve the trial court of the duty to give such an instruction where it is warranted by the evidence, nor will it preclude the defendant from raising the point on appeal. (*People* v. *Castillo, supra,* 70 Cal.2d 264, 271, fn. 5; *People* v. *Wilson, supra,* 66 Cal.2d 749, 759-760; *People* v. *Ford, supra,* 65 Cal.2d 41, 58, fn. 9; *People* v. *Baker, supra,* 42 Cal.2d 550, 576-577; cf. *People* v. *Baglin, supra,* 271 Cal.App.2d 411, 416-418.

In *Castillo* (see 70 Cal.2d at pp. 268-269), as in this case, there were instructions on diminished capacity (see fns. 3 and 4, *supra*), and instructions on second degree murder (CALJIC No. 305 (Rev.), *supra*). In each case the jury found first degree murder. Logically it is difficult to find prejudice because of errors in instructions on an offense of lesser dignity than second degree murder, when the jury rejected the latter charge and found first degree murder. (See *People* v. *Aubrey, supra,* 253 Cal.App.2d at p. 919.) In *Castillo,* however, the court approved and applied (70 Cal.2d at p. 271)

the doctrine enunciated in *People* v. *Modesto, supra,* as follows: "It is . . . settled that defendant's right to a manslaughter instruction when there is evidence thereof precludes not only our weighing that evidence to determine the likelihood that a properly instructed jury would have found manslaughter, but also our attempting to determine how the failure to present the issue of manslaughter to the jury may or may not have influenced its choice between first and second degree murder. Since we do not know what effect an instruction that the jury could return a verdict of manslaughter would have had on its deliberations, we cannot conclude that it necessarily rejected the evidence of manslaughter. Defendant was entitled to a jury trial on all of the issues presented by the evidence, and that right he was denied." (59 Cal.2d at p. 731. See also, *People* v. *Wilson, supra,* 66 Cal.2d 749, 764; *People* v. *Conley, supra,* 64 Cal.2d 310, 319-320; *People* v. *Conley, supra,* 268 Cal.App.2d 47, 52; *People* v. *Coyne* (1968) 263 Cal.App.2d 445, 450-451 [69 Cal.Rptr. 736]; *People* v. *Stephanson* (1968) 259 Cal.App.2d 181, 184-188 and cf. 188-190 [66 Cal.Rptr. 155]; and *People* v. *Bowers* (1964) 229 Cal.App.2d 590, 598 [40 Cal.Rptr. 435].)

In the light of the principles enunciated in *People* v. *Burns, supra,* 88 Cal.App.2d 867, 871, and elucidated in *People* v. *Carmen, supra,* 36 Cal.2d 768, 773, the People's arguments predicated upon the insufficiency of the evidence to show diminished capacity, or intoxication, cannot be sustained. There is some evidence deserving of consideration directed to these issues.

 There are several factors, however, which distinguish this case from those discussed above. An analysis of the instructions reveals that the court deliberately removed the reference to manslaughter at the end of the instruction on diminished capacity (see fn. 4 *supra*), and refused to give the manslaughter instructions because the defendant Williams was an admitted felon in possession of a concealable firearm, in violation of section 12021 of the Penal Code.[10] (See *People*

---

[10]Williams was charged with and found to have suffered a prior federal conviction of violation of the Dyer Act (interstate transportation of a stolen vehicle). Williams originally stood mute on this charge and a denial was entered on his behalf. The record does not reflect when, if ever, the denial was withdrawn. The allegation of the prior in the indictment was not, however, revealed to the jury. (See Pen. Code, §§ 1025 and 1093, subd. 1.) Williams admitted the felony conviction on cross-examination. He also acknowledged that a .22 caliber revolver, which one of the patrons had identified as exactly like the weapon used by Asher in the robbery, was his gun. Although he testified he had stolen it after the

v. *McCullough* (1963) 222 Cal.App.2d 712, 717 [35 Cal.Rptr. 591].) In *People* v. *Robillard, supra,* the court observed, ''. . . at the time defendant was stopped by the officer he was on probation from felony convictions in both the state and the federal courts. Since possession of a concealed firearm by any person who has been previously convicted of a felony is also a felony in this state (Pen. Code, § 12021), the death of the officer would also automatically be at least second degree murder on this theory.'' (55 Cal.2d at p. 98. See also, *People* v. *Ford, supra,* 65 Cal.2d 41, 47; *People* v. *Schader, supra,* 62 Cal.2d 716, 732; and *People* v. *Ford, supra,* 60 Cal.2d 772, 795; but cf. *People* v. *Dewberry* (1959) 51 Cal.2d 548, 554 [334 P.2d 852]; and *People* v. *Lovato* (1968) 258 Cal.App.2d 290, 294-296, and dissent pp. 299-301 [65 Cal.Rptr. 638].) The two *Ford* cases involved a question of diminished capacity because of the defendant's intoxication. In response to the contention that it was error to refuse requested manslaughter instructions, the court stated in the second case, ''As Justice Schauer pointed out, a homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen. Code, § 189) constitutes second degree murder. [Citation.]'' (65 Cal.2d at pp. 57-58.)

Defendant seeks to come within the provisions of the caveat contained in a footnote in *Ford* reading as follows: ''Of course, pursuant to the *Conley* rule, manslaughter instructions must be given notwithstanding the involvement of the felony-murder rule in those cases where there is any factual dispute as to whether the homicide was committed during the perpetration of a relevant felony or where the issue of diminished capacity or intoxication is raised as a defense to the felony charge as well as to the murder charge.'' (*Id.* p. 58, fn. 9; and *People* v. *Baglin, supra,* 271 Cal.App.2d 411, 414-417.) In this case there was a factual dispute as to whether the homicide was committed during the perpetration of robbery, or whether the robbery independently followed the shooting. The jury was, as noted above, fully instructed on the principles necessary for the application of the felony-

---

robbery, he also acknowledged that it might have been in the car when they came to San Francisco. Williams testified that he stole the sawed-off shotgun prior to the robbery; that he had it with him on the day prior to the homicide; and that he had it with him on the following day when they came to San Francisco; that he kept the gun with him inside his trench coat. He claimed he could not remember whether he took the sawed-off shotgun in to the bar where the killing and robbery occurred, or any other events before or after the shooting.

murder rule. There was no issue concerning the admitted violation of Penal Code section 12021, and the court properly concluded that the homicide, if not a felony-murder, was "as a matter of law, at least murder in the second degree." (See *People* v. *Ford, supra,* 65 Cal.2d at p. 58.) The issues of diminished capacity and intoxication (see *infra*) were raised as a defense to the robbery charge, and the jury was fully instructed on those issues. Penal Code section 12021 does not require any specific intent. (*People* v. *Mendoza* (1967) 251 Cal.App.2d 835, 842-843 [60 Cal.Rptr. 5]; *People* v. *Nieto* (1966) 247 Cal.App.2d 364, 368 [55 Cal.Rptr. 546]; *People* v. *McCullough, supra,* 222 Cal.App.2d 712, 717-718; *People* v. *Vanderburg* (1963) 214 Cal.App.2d 455, 462 [29 Cal.Rptr. 553]; *People* v. *Gonzales* (1925) 72 Cal.App. 626, 630 [237 P. 812].) Although an unknowing possession might relieve defendant of criminal responsibility (see *People* v. *Gonzales, supra,* at p. 631), Williams' admissions under oath preclude such a finding in this case.

In *People* v. *Lovato, supra,* one opinion questions whether the application of the inherently dangerous felony-second degree murder principle should preclude a showing of diminished capacity (Stone, J., 258 Cal.App.2d at p. 299). Two justices concurred that the possession of a concealable weapon by an alien was not inherently dangerous in all cases, and did not preclude a finding of manslaughter. The second justice noted, ". . . there is a clear, rational and logical distinction between the nature of the offense when committed by an ex-felon and when committed by an alien. An ex-felon by his felony conviction has demonstrated instability and a propensity for crime. Thus, there is a core of logic in the assumption that if such a person arms himself with a concealable weapon he commits a crime *per se* dangerous to human life." (258 Cal.App.2d at pp. 295-296.) So in this case whether Williams knowingly armed himself to commit robbery or to settle any altercations in which he might become engaged, he was committing a felony inherently dangerous to human life, and should be bound by the consequences even though his capacity to form a specific intent was impaired by his mental condition, or voluntary intoxication, or use of drugs, or a combination of any of those factors. (See Pen. Code, § 22.)

Even though it were error to fail to give an instruction on manslaughter to cover the situation if the felony-murder rule were found inapplicable, the record in this case precludes a finding of prejudice. In *People* v. *Modesto, supra* (59 Cal.2d

at p. 731), and the other cases cited for the principle that the jury's selection of first degree, rather than second degree murder, does not preclude prejudice in the failure to give appropriate instructions on manslaughter, there was no juxtaposition of felony-murder charges as in this case. In *Modesto* and *Wilson* (66 Cal.2d 749) the felony-murder rule was an alternative theory of the prosecution. In neither case did the record indicate on which theory the jury had returned its verdict of first degree murder, and in *Wilson* there was a failure to properly instruct on factors which would enable the jury to determine whether a felony, burglary, had been committed. In this case, on the other hand, the convictions of Asher and Carrafa indicate that the jurors applied the felony-murder rule against all three defendants as clearly as though they had rendered a special verdict. No other conclusion is permissible under the instructions which were given by the court.

In *People* v. *Sievers* (1967) 255 Cal.App.2d 34 [62 Cal. Rptr. 841] (hearing in Supreme Court denied) the defendant was charged with murder and robbery in connection with the death of a victim who was found beaten and robbed. He was found guilty on both counts. Evidence was introduced to show defendant's diminished capacity to form an intent or indulge in premeditation, and instructions were given on that defense. The trial court refused defendant's proposed instructions on manslaughter and charged the jury that the defendant was either innocent of the charge of murder or guilty of murder in the first degree. The court stated, ''. . . the defense of diminished capacity is applicable to all crimes which require specific intent, including robbery. If in fact appellant did not possess sufficient mental capacity to form an intent to deprive his victim permanently of his property, he could not be guilty of robbery, and hence not guilty of felony murder. Appellant's defense of diminished mental capacity was raised against both the murder charge and the robbery charge. If the jury had sustained his defense as to the robbery charge and thus found him not guilty of that offense, it would then have been required to consider appellant's guilt on the murder charge. As to this offense also, diminished capacity was an issue, and if the jury had sustained it they might well have found him guilty of a lesser included offense, such as manslaughter. Under the circumstances of this case, manslaughter instructions were required, notwithstanding the involvement of the felony-murder rule. (See *People* v. *Ford,* 65 Cal.2d 41, 58, fn. 9. . . .)'' (255 Cal.App.2d at p. 39.) The court concluded:

"Despite the error, however, appellant suffered no prejudice. The jury was fully and fairly instructed on the defense of diminished capacity. The court's instructions ran both to the murder and robbery charges. The jury found appellant guilty of robbery. It thus rejected his claim of diminished capacity as to this offense. Since appellant's victim met his death in the course of the robbery, the felony-murder rule is applicable, and appellant was properly found guilty of first degree murder." (*Id.* See also, *People* v. *Teale, supra,* 63 Cal.2d 178, 192-193; *People* v. *Chapman, supra,* 261 Cal.App.2d 149, 172-174 and 176; *People* v. *Fortman, supra,* 257 Cal.App.2d 45, 50-52 and 55-56; and cf. *People* v. *Stewart* (1968) 267 Cal.App.2d 366, 374 [73 Cal.Rptr. 484].)

No prejudicial or reversible error is found in the failure to give instructions on manslaughter. The foregoing makes it unnecessary to consider, as urged by the People, that Williams' recantation at the penalty trial (discussed *infra*) bars the assertion of any error in the instructions on diminished capacity.

*Instruction on Intoxication*

The court instructed the jury in the language of Penal Code section 22 as follows: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent, is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act." This instruction was followed by the instructions on diminished capacity which have been referred to above. (See fn. 6, *supra,* and text following. Cf. CALJIC (1967 Cum. Pocket Part) No. 319 (Rev.).)

In *People* v. *Ford, supra,* 60 Cal.2d 772, the court observed, "As the issue of intoxication was thus clearly raised by the evidence, it was essential that the jury be correctly instructed regarding the possible effect of that evidence on the state of mind in which defendant did the acts in question and hence as to whether such acts were or were not the product of that specific and deliberately formed and executed intent to kill which constitutes first degree murder." (60 Cal.2d at p. 798. See also *People* v. *Teale, supra,* 63 Cal.2d 178, 193; *People* v. *Spencer* (1963) 60 Cal.2d 64, 86-87 [31 Cal.Rptr. 782, 383 P.2d 134]; *People* v. *Baker, supra,* 42 Cal.2d 550, 571-573;

*People* v. *Conley, supra,* 268 Cal.App.2d 47, 52-53; and *People* v. *Graves* (1968) 263 Cal.App.2d 719, 726-729 [70 Cal.Rptr. 509].) In *People* v. *Baker, supra,* the court ruled that the giving of an instruction embodying only the first sentence of Penal Code section 22 "without adding that defendant's intoxication could, however, be considered in determining the degree of the offense committed" was error. (42 Cal.2d at p. 573.) In *People* v. *Spencer, supra,* the trial court gave an instruction embodying the statutory language followed by an elaboration of the principle embodied in the first sentence. (60 Cal.2d at p. 86, fn. 14. See CALJIC (1958 rev. ed.) No. 78.) The court ruled, ". . . the giving of CALJIC No. 78 in the circumstances of this case could well leave a jury in a state of confusion or even with the impression that as a matter of law a defendant's voluntary intoxication can have no effect on the criminality of his conduct. The subject instruction is intended to be, and should be, used only where the crime charged does not require specific intent. [Citation.]" (*Id.,* at p. 87.) In *People* v. *Ford, supra,* the court followed *Spencer* in condemning the use of CALJIC 78 under similar circumstances, and further condemned former CALJIC (1958 rev. ed.) No. 319 (60 Cal.2d at p. 796, fns. 12 and 13, and accompanying text). In *People* v. *Graves, supra,* this court held that the use of an instruction emphasizing the effect of intoxication on the requisite specific intent (CALJIC (1958 rev. ed.) No. 78-B) would not cure the erroneous use of CALJIC 78 where specific intent is involved. (263 Cal.App.2d at pp. 726-729; but cf. *People* v. *Fortman, supra,* 257 Cal. App.2d 45, 52.) Finally, in the latest *Conley* case the court pointed out that any reference to the idea expressed in the first sentence of Penal Code section 22 in a case involving specific intent created the confusion denounced in *Spencer.* In *Conley* the trial court apparently gave CALJIC (1967 Cum. Pocket Part) No. 78 (Rev.) and No. 319 (Rev.). The second sentence of the former elaborates on the first sentence of section 22. The latter instruction is identical with that given in this case. The criticism of CALJIC No. 319 is tempered with the following language: "When there is an issue of diminished capacity due to intoxication, an instruction in the language of Penal Code section 22 is not necessarily error. (*People* v. *Sievers,* 255 Cal.App.2d 34, 37. . . .)" (268 Cal. App.2d at p. 53. See also *People* v. *Fain* (1969) 70 Cal.2d 588, 596-597 [75 Cal.Rptr. 633, 451 P.2d 65].)

A review of the instructions in this case, as they have

been referred to above, reveals that the trial court emphasized and reiterated that intoxication could occasion diminished capacity which would negate the existence of the requisite mental state for either robbery or murder. By no stretch of the imagination could the jury have been confused by the reading of the first sentence of section 22 in connection with the other instructions. No error can be predicated upon the giving of the instruction in the language of CALJIC 319 (Rev.).

## Failure to Offer Verdicts on Robbery

 Asher and Carrafa each assert, "The trial court erred when it refused to instruct that appellants could be found guilty of robbery as a lesser included offense." This contention is predicated upon an instruction concerning robbery which was submitted by Carrafa[11] and refused by the court as covered elsewhere. The jury were fully instructed on the elements of the offense of robbery. (See text, *supra,* under "Instructions on Manslaughter.")

The gravamen of defendants' complaint is the failure of the court to submit to the jury verdict forms which would enable the jury to find Carrafa and Asher guilty of robbery. The record suggests, and the People do not deny, that Carrafa's counsel in fact requested and was denied the submission of such a form of verdict. He so alleged in his argument on his motion for new trial. They claim that a fundamental unfairness exists in a situation where the defendant is guilty of murder, if at all, on a theory of vicarious liability and he is at the same time denied a right to have the jury find him guilty of the less serious offense, which would be the only offense in which he actively participated. This argument fails to recognize the deterrent policy of the law as embodied in the felony-first degree murder rule, and the rule of vicarious responsibility. "The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally by holding them strictly responsible for killings they commit. [Citations]" (*People* v. *Washington, supra,* 62 Cal.2d 777, 781. See also, *People* v. *Lilliock, supra,* 265 Cal.App.2d 419.

[11]The proposed instruction read, "Degree of Robbery Robbery which is perpetrated by torture or by a person or by two or more persons any one of them being armed with a dangerous or deadly weapon is robbery in the first degree. All other kinds of robbery are of the second degree.

"If you should find the defendant guilty of robbery, it will be your duty to determine the degree thereof and to state that degree in your verdict." (CALJIC No. 210-A.)

431; and cf. *People* v. *Ballentine* (1952) 39 Cal.2d 193, 197 [246 P.2d 35].) Defendants' contention also fails to distinguish the precise issue presented by the homicide charge from other offenses which might have been committed at or about the same time. There were several possibilities, and the jury was correctly instructed as to all of them.

If there was a preexisting plan to rob the bar and the killing occurred while the defendants were engaged in perpetrating that crime and in furtherance of that plan, all of the defendants were chargeable with felony murder of the first degree. The jury so found. It was unnecessary to charge the jury that they could find one or another of the defendants guilty of the robbery necessary to establish the foregoing offense, because if guilty at all, such a defendant was guilty of the more grievous offense. The following principle applies to Asher and Carrafa: ". . . under Penal Code section 189, the trial court properly instructed the jury that appellants were either guilty of first degree murder or not guilty of murder at all. [Citations.]" (*People* v. *Ketchel* (1963) 59 Cal.2d 503, 525 [30 Cal.Rptr. 538, 381 P.2d 394] [disapproved on other grounds *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810], vacated *People* v. *Ketchel* (1966) 63 Cal.2d 859 [48 Cal.Rptr. 614, 409 P.2d 694].] See also *People* v. *Witt* (1915) 170 Cal. 104, 107 [148 P. 928].) Even if it could be said that robbery was included in the general charge of murder (see discussion, *infra*), the court properly refused the instruction because of the general rule that it is not error to omit or refuse to instruct the jury on their right to convict of lesser offenses included in the offense charged when the evidence shows, or tends to show, that the defendant, if guilty at all, is guilty of the offense charged. (*People* v. *Thomas* (1962) 58 Cal.2d 121, 127 [23 Cal.Rptr. 161, 373 P.2d 97] ; *People* v. *McCoy* (1944) 25 Cal.2d 177, 187-188 [153 P.2d 315] ; *People* v. *Allison* (1966) 245 Cal.App.2d 568, 572-574 [54 Cal.Rptr. 148] ; *People* v. *Morrison* (1964) 228 Cal.App.2d 707, 712-714 [39 Cal. Rptr. 874] ; and see *People* v. *Welborn* (1966) 242 Cal.App.2d 668, 679-680 [51 Cal.Rptr. 644].)

A second theory, which the jury was free to adopt under the instructions and the evidence, was that although there was a preexisting conspiracy and plan to rob the bar, Williams' acts were not performed in the perpetration of that plan or in furtherance of the conspiracy to rob, either because he did not have the capacity to form the intent to rob, or because the

killing resulted from an altercation that was unrelated to the planned robbery. The jury rejected this theory, but it is obvious that under it the homicide committed by Williams was not within the felony-first degree murder rule, and the offense of robbery could in no sense be deemed an offense included in the charge of murder.

A third hypothesis was that the intent to rob did not arise until after Williams had shot Kammeyer. Here again the robbery charge would be completely separate from the homicide charge. (See *People* v. *Butler* (1967) 65 Cal.2d 569, 574 [55 Cal.Rptr. 511, 421 P.2d 703]; *People* v. *Carnine, supra,* 41 Cal.2d 384, 388-389.)

Defendants' contention is predicated on the general rule referred to above that, ". . . the court should instruct the jury upon every material question upon which there is any evidence deserving of any consideration whatever"; and upon the particular rule stated as follows: "It is the duty of the court to instruct the jury in regard to any included offense which the evidence tends to prove." (*People* v. *Burns, supra,* 88 Cal.App.2d 867, 871. See also Pen. Code, §§ 1159 and 1093, subd. 6; *People* v. *Modesto, supra,* 59 Cal.2d 722, 727; *People* v. *Miller, supra,* 57 Cal.2d 821, 829-830; *People* v. *Dewberry, supra,* 51 Cal.2d 548, 555; *People* v. *Carmen, supra,* 36 Cal.2d 768, 773; *People* v. *Coyne, supra,* 263 Cal. App.2d 445, 450-451; *People* v. *Garcia* (1967) 250 Cal.App.2d 15, 17 [58 Cal.Rptr. 186]; *People* v. *Roth, supra,* 228 Cal. App.2d 522, 527-531 [39 Cal.Rptr. 582]; and *People* v. *Lewis* (1960) 186 Cal.App.2d 585, 596-599 [9 Cal.Rptr. 263].)

"An indictment or information charging murder . . . also charges all lesser offenses necessarily included in the crime of murder, including voluntary and involuntary manslaughter. [Citations.]" (*In re McCartney* (1966) 64 Cal.2d 830, 831 [51 Cal.Rptr. 894, 415 P.2d 782]. See also *People* v. *Marshall* (1957) 48 Cal.2d 394, 399, fn. 5 [309 P.2d 456]; *People* v. *Witt, supra,* 170 Cal. 104, 107-108; *People* v. *McFarlane* (1903) 138 Cal. 481, 484 [71 P. 568, 72 P. 48, 61 L.R.A. 245]; and *People* v. *Beach* (1968) 263 Cal.App.2d 476, 488-489 [69 Cal.Rptr. 394].) The foregoing cases do not indicate whether separate offenses which may be used to establish criminal responsibility for murder under the felony-murder rule as applied to first or second degree murder, or used to establish an unlawful act as a predicate of involuntary manslaughter or manslaughter in the driving of a vehicle, are lesser and included offenses of a homicide charge of which such separate offense is a part.

The general rule concerning included offenses, originally stated in connection with double jeopardy (see Pen. Code, § 1023), has often been reiterated and has been applied in cases arising under section 1159 of the Penal Code. ██ "It is clear that where an offense cannot be accomplished without necessarily committing another offense, the latter is a necessarily included offense. If, in the commission of acts denounced by one statute, the offender must always violate another, the one offense is necessarily included in the other." (*People* v. *Krupa* (1944) 64 Cal.App.2d 592, 598 [149 P.2d 416]. See also *People* v. *Marshall, supra,* 48 Cal.2d 394, 397-398; *In re Hess* (1955) 45 Cal.2d 171, 174 [288 P.2d 5]; *People* v. *Greer* (1947) 30 Cal.2d 589, 596 [184 P.2d 512]; *People* v. *Kerrick* (1904) 144 Cal. 46, 47 [77 P. 711]; *People* v. *Blunt* (1966) 241 Cal.App.2d 200, 204 [50 Cal.Rptr. 440]; and *People* v. *Chandler* (1965) 234 Cal.App.2d 705, 708 [44 Cal.Rptr. 750]. Cf. *People* v. *Gentry* (1969) 270 Cal.App.2d 462, 474-475 [76 Cal.Rptr. 336]; *People* v. *Powell* (1965) 236 Cal.App.2d 884, 886 [46 Cal.Rptr. 417]; *People* v. *Hensel* (1965) 233 Cal.App.2d 834, 838 [43 Cal.Rptr. 865]; and *People* v. *Leech* (1965) 232 Cal.App.2d 397, 398 [42 Cal.Rptr. 745].)

The principle has been expanded upon by cases which have permitted conviction for other offenses embraced with the facts set forth in the indictment or information, and for offenses consistent with the pleading which, through the evidence adduced at the preliminary hearing or by other means, have been accepted as issues in the case.

In *People* v. *Marshall, supra,* 48 Cal.2d 394, the court concluded, after reviewing existing precedents, "Since the decisions as to included offenses, so far as they relate to choice of a standard to measure what offenses are 'necessarily included' within the meaning of section 1159 of the Penal Code, have not expressly considered or decided the question of selection as between the language of the accusatory pleading and the statutory definition, we base our choice of the specific language of the accusatory pleading upon considerations of fairness to both parties." (48 Cal.2d at p. 405. See also *People* v. *Powell, supra,* 236 Cal.App.2d 884, 886; *People* v. *Chandler, supra,* 234 Cal.App.2d 705, 708; *People* v. *Hensel, supra,* 233 Cal.App.2d 834, 838-839; *People* v. *Troyn* (1964) 229 Cal.App.2d 181, 185 [39 Cal.Rptr. 924]; *People* v. *Lewis, supra,* 186 Cal.App.2d 585, 600; and cf. *People* v. *Leech, supra,* 232 Cal.App.2d 397, 398.)

In *People* v. *Collins* (1960) 54 Cal.2d 57 [4 Cal.Rptr. 158, 351 P.2d 326], the court rejected the defendants' "contention that they could not properly be convicted of . . . statutory rape [Pen. Code, § 261, subd. 1], under an information charging them with forcible rape." (54 Cal.2d at p. 59.) The court ruled, "The decisive question in the present case is whether the variance was of such a substantial character as to have misled defendants in preparing their defense. There is no indication whatever that defendants were prejudiced in that respect. Not only was it proved at the preliminary hearing that the prosecuting witness was 15 years of age, but the attorney for one of the defendants then expressed the view that the evidence tended to show statutory rape only." (*Id.*, at p. 60. See also *People* v. *Mayes* (1968) 262 Cal.App.2d 195, 199 [68 Cal.Rptr. 476] ; *People* v. *Chandler, supra,* 234 Cal. App.2d 705, 709 ; *People* v. *Hensel, supra,* 233 Cal.App.2d 834, 839 ; and cf. *People* v. *Leech, supra,* 232 Cal.App.2d 397, 399.)

Defendants Asher and Carrafa contend that the foregoing authorities indicate that they could have been convicted of robbery under the indictment as framed, and that therefore it was error to fail to give the requested form of verdict. However, *People* v. *Marshall, supra,* distinguished between a simple statutory pleading, and an indictment or information setting out further facts. The opinion states : "A person charged simply with robbery 'in the words of the statute describing the offense' [fn. omitted see Pen. Code, § 952] would not be charged with and could not be properly convicted of the offense defined by [former] section 503 [of the Vehicle Code] because the accusatory pleading would not inform the defendant that he must be prepared, at the trial, to contravene evidence that he took a particular kind of personal property, a vehicle. [Citations.]" (*People* v. *Marshall, supra,* 48 Cal.2d 394, 399, fn. omitted. See also *People* v. *Lewis, supra,* 186 Cal.App.2d 585, 600.)

Some cases have touched on the matter of the offenses included under a general homicide charge. In *People* v. *Mayes, supra,* 262 Cal.App.2d 195, the court considered the propriety of sustaining a conviction of battery under a charge of murder. The opinion states, "Manifestly, there are several methods by which a murder can be committed without touching the victim and hence without committing a battery in the technical sense. The starving, frightening or luring of a victim to his death are a few examples. Thus, it is arguable that a battery is not a necessarily included offense of the crime of

murder.'' (262 Cal.App.2d at p. 199, fn. omitted. See also *People* v. *Welborn, supra,* 242 Cal.App.2d 668, 669; and *People* v. *Lewis, supra,* 186 Cal.App.2d 585, 599-600.) The court did not answer ''this troublesome question'' but concluded, ''Manifestly, a defendant cannot be permitted to complain that he was convicted of a lesser offense not charged in the indictment or information where, as here, (1) there was ample evidence to sustain the conviction; (2) the defendant, prior to the trial, had full knowledge of all of the circumstances relied upon by the People, and there was no variance from these circumstances which causes us to reasonably believe that defendant might have presented a different defense or additional evidence had he contemplated a conviction on the lesser offense; and (3) the defendant actually requested the court to submit the battery issue to the jury, and there is good cause to believe that he escaped conviction on the greater offense for this very reason.'' (*Id.,* p. 201. See also *People* v. *Ghione* (1953) 115 Cal.App.2d 252, 254-255 [251 P.2d 997]; and cf. *People* v. *Blunt, supra,* 241 Cal.App.2d 200, 204-205; *People* v. *Powell, supra,* 236 Cal.App.2d 884, 887-888; *People* v. *Chandler, supra,* 234 Cal.App.2d 705, 709; and *People* v. *Hensel, supra,* 233 Cal.App.2d 834, 838-840.)

In *People* v. *Welborn, supra,* the court observed ''We need not here determine the question whether assault with a deadly weapon was necessarily included within the 'charge' of murder as that charge was here framed [second degree murder].'' (242 Cal.App.2d at p. 679, fn. omitted.) The court pointed out the difficulties in treating it as an included offense, and disposed of the contention that the instruction should have been given, by ruling. ''In any event it was the defendant's election to make [a request for the instruction].'' (*Id.,* at p. 680. Cf. *People* v. *Ireland* (1969) 70 Cal.2d 522, 539-540 [75 Cal.Rptr. 188, 450 P.2d 580], as modified.)

In *People* v. *Lewis, supra,* the defendant contended that it was error to refuse to give a requested instruction on felonious assault when the evidence in a homicide case permitted a finding that the death was not proximately caused by the acts of the defendant. The court applied the rule of *People* v. *Marshall, supra,* 48 Cal.2d 394, and concluded, ''The indictment here did not charge murder by this means [murder with a hatchet], but merely the statutory crime in general terms. Under *People* v. *Marshall, supra,* and *In re Hess, supra* [45 Cal.2d 171, 175 (288 P.2d 5)], the defendant could not have been convicted of the assault described. Therefore, there was

no error in the trial court's refusal to give the requested instruction." (186 Cal.App.2d at p. 600. See also *People* v. *Travis* (1959) 171 Cal.App.2d 842, 844 [341 P.2d 851]; and *People* v. *Gallagher* (1959) 168 Cal.App.2d 417, 424 [336 P.2d 259].)

▮ The evidence reveals that there were several victims of the robbery in addition to the deceased Kammeyer. The general charge of robbery is sufficient to sustain the felony-first degree murder charge. Defendants could be convicted and sentenced for separate offenses against separate victims, but could only be sentenced for one offense against Kammeyer. (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 18-21 [9 Cal.Rptr. 607, 357 P.2d 839]; *People* v. *Chapman, supra,* 261 Cal.App.2d 149, 179-180.) The question presents itself as to which victim should be selected as the lesser included offense to the murder charge. It is presumably Kammeyer in this case, but if the victim of the killing were not a robbery victim, there would be no way of determining which robbery was the lesser and included offense of the murder charge.

There was no error in failing to submit to the jury the separate issue of whether Asher and Carrafa were guilty of robbery. On analysis it appears that the real complaint of these defendants is that they were not charged with all of the robberies they committed, and that such charges were not joined (Pen. Code, § 954) with the murder count. Attention has not been directed to any principle which permits the accused to determine the offenses with which he will be charged. It is unnecessary to determine in these proceedings whether, as urged by defendants, any further prosecution for the robberies would be barred by the rule against multiple prosecutions. (See Pen. Code, § 654; and *Kellett* v. *Superior Court* (1966) 63 Cal.2d 822, 825-827 [48 Cal.Rptr. 366, 409 P.2d 206].)

*Evidence of Other Offense*

▮ Defendants Carrafa and Williams contend that the court erroneously admitted, over timely objection, evidence that Carrafa, armed with a shotgun, and a companion armed with hand gun held up a bar in Oakland at 11 a.m. on the day prior to the killing. They assert that the testimony was improper rebuttal evidence (see Pen. Code, § 1093, subd. 4; *People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665]; and cf. *People* v. *Kelley* (1967) 66 Cal.2d 232, 241 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 263 [32 Cal.Rptr. 199, 383 P.2d 783]; *People* v.

*Wein* (1958) 50 Cal.2d 383, 406-407 [326 P.2d 457] ; *People* v. *Ambriz* (1968) 260 Cal.App.2d 842, 845-847 [67 Cal.Rptr. 525] ; *People* v. *McIntyre* (1967) 256 Cal.App.2d 894, 899 [64 Cal.Rptr. 530] ; and *People* v. *Jeffrey* (1965) 233 Cal.App.2d 279, 281-283 [43 Cal.Rptr. 524]), and that in any event it should have been excluded under "the rule that such proof is to be received with 'extreme caution,' and if its connection with the crime charged is not clearly perceived, the doubt is to be resolved in favor of the accused, instead of suffering the minds of the jurors to be prejudiced by an independent fact, carrying with it no proper evidence of the particular guilt. [Citations.]" (*People* v. *Albertson* (1944) 23 Cal.2d 550, 577 [145 P.2d 7]. See also Evid. Code, § 1101, subd. (b) ; *People* v. *Kelley, supra,* 66 Cal.2d 232, 238-245; *People* v. *Beverly* (1965) 233 Cal.App.2d 702, 719-722 [43 Cal.Rptr. 743] ; *People* v. *Davis* (1965) 233 Cal.App.2d 156, 160-162 [43 Cal.Rptr. 357] ; *People* v. *Nazzaro, supra,* 223 Cal.App.2d 375, 378-380 [35 Cal.Rptr. 879] ; *People* v. *Channell* (1955) 136 Cal.App.2d 99, 109-115 [288 P.2d 326] ; and cf. *People* v. *Cramer* (1967) 67 Cal.2d 126, 129-130 [60 Cal.Rptr. 230, 429 P.2d 582] ; *People* v. *Whitehorn, supra,* 60 Cal.2d 256, 262-263; *People* v. *Peete* (1946) 28 Cal.2d 306, 314-319 [169 P.2d 924] ; and *People* v. *Gallagher, supra,* 168 Cal.App.2d 417, 423-426.)

Reference to the earlier robbery first appears in the record in the opening statement made by the attorney for Asher at the beginning of the trial. He stated, "Our testimony and our evidence will show you and put Mr. Williams and Mr. Carrafa in possession of that shotgun several days before this holdup, and the testimony will come through a bartender of a bar in the East Bay who will come in and testify that Williams and Carrafa entered his bar and held him up, and that they had a shotgun, a sawed-off shotgun, and that same bartender will put the revolver in Mr. Williams' and Mr. Carrafa's sole and exclusive possession, because he is going to testify that when he was held up they also had a revolver." This reference went unchallenged. A second reference drew objections on behalf of Carrafa and Williams, and they jointly moved for a mistrial. The court apparently sustained the objection, denied the motion for a mistrial as to both defendants, and admonished the jury that the statements of counsel were not to be considered as evidence.

No evidence of the earlier robbery was presented in the People's case in chief. Carrafa was the first defendant to present his defense. In the opening statement made on his

behalf, his attorney stated, "He will tell you that he and his two companions entered the Hearth with no thought whatsoever of . . . robbing anybody . . . ," and "that he . . . reluctantly . . . did go along with the robbery as it later transpired."

In his testimony Carrafa acknowledged that he and Asher had borrowed the shotgun from a friend of Asher in Los Angeles; that he had shortened the barrel so it would be small enough to put under the dashboard of a car; that he last saw the shotgun a day or two before the holdup in a closet in a home in Oakland; that when they came to San Francisco the day before the homicide he thought the shotgun was in Oakland; and that after the homicide it was broken up and thrown out of the car while driving to Sacramento

Carrafa also testified that Williams left the .22 pistol at the hotel room on the day before the homicide; that he took it out with him to seek Williams; that he met Asher, and gave the loaded pistol to Asher; and that he saw the pistol in Asher's hotel room the next day; and that he and Asher were unarmed at the Hearth bar.

He related that he had no intention of robbing the "New Hearth Bar" when he walked into it with Asher and Williams; that he had no indication a holdup was taking place until Williams spoke after the shot was fired; that he followed Asher and the owner into the back office and joined in asking the owner to open the safe; that he attempted to open the safe with the combination numbers obtained from Kammeyer; and that he took the money from the cash register when Williams pointed the shotgun at him and ordered him to do so.

On cross-examination by the prosecution he reiterated that he last saw the shotgun in a closet in Oakland. He was not initially questioned about the earlier robbery. Asher's attorney brought out that Carrafa and Williams had been in the Coat of Arms bar on the morning of the day before the homicide and had the pistol and sawed-off shotgun with them. The deputy district attorney thereafter was permitted to reopen his cross-examination and elicited similar testimony. There was a conflict in Carrafa's testimony as to who had the pistol and who had the shotgun. Thereupon the prosecutor interrupted his examination with the suggestion that the propriety of further questions should be taken up outside of the presence of the jury. The court postponed that issue, and shortly thereafter defendant Asher began presentation of his case.

The following morning the question of examining Carrafa

concerning the earlier robbery was taken up outside the presence of the jury. The prosecution wanted to impeach Carrafa's testimony that he had not seen the shotgun for two days, and to destroy any impression that Carrafa participated in the activities because of a fear of Williams. The hearing brought out that Asher had the bartender, who was the victim of the earlier robbery, present under subpoena and planned to use his testimony. The hearing ended without a ruling by the court, but the bartender was instructed in open court to return the following day.

After Asher made an offer of proof concerning the prior robbery, the court sustained an objection interposed by Carrafa and Williams to the production of this testimony by Asher because ". . . . the probative value of this evidence has so little value to Mr. Asher's defense, as compared to the prejudicial effect it would have on the other two defendants, . . ." The prosecutor then indicated a desire to call the witness if he did not receive certain answers in his renewed examination of Carrafa.

The defendant Asher subsequently rested his case. Carrafa was recalled to the stand so the prosecutor could complete his cross-examination. Over objection from Carrafa and Williams he was asked if he and Williams held up the Coat of Arms tavern on the day prior to the homicide with the .22 pistol and the shotgun. Carrafa refused to answer because the answer might tend to incriminate him.

Thereafter the prosecutor called the bartender in rebuttal. Over the objections of Carrafa and Williams, he testified that on the morning of the day preceding the homicide he was held up and robbed by Carrafa with a shotgun, and another man with a pistol, whom he could not identify. The following morning the court gave the jurors an instruction patterned on CALJIC (1958 rev.ed.) No. 33.[12] A similar instruction was given in the final charge of the court.

---

[12]This instruction read: "Ladies and gentlemen of the jury, I meant to read this instruction to you yesterday when we had this testimony from Mr. Nielsen concerning the Coat of Arms bar.

"'Evidence is offered in this case for the purpose of showing that some of the defendants here committed another crime other than the one for which they are accused today. Such evidence was received for a limited purpose only. Not to prove distinct offenses, or continual criminality, but for such bearing, if any, as it might have on the question whether the defendants are innocent or guilty of the crime charged against them.

"'Now, you are not permitted to consider that evidence for any other purpose, and as to that purpose, you must weigh such evidence as you do all other in the case, and the value, if any, of such evidence depends on whether or not it tends to show the identity of the person who committed

Defendants claim that the evidence was inadmissible on the issue of intent because the evidence of the intent to rob—after the homicide—was unequivocal. (See *People* v. *Channell, supra,* 136 Cal.App.2d at pp. 112-113.) They concede that there was an issue with respect to the time when the intent to rob the Hearth bar was formed, but they contend that the evidence of the prior offense throws no light on that issue. To the contrary, the prior actions of Carrafa and Williams serve to illuminate the motive and intent with which they carried weapons into the Hearth bar on the day following the prior hold up. It is relevant to the question of whether there was a plan or scheme to hold up the second bar, and it tended to rebut the contention that the exhibition and the use of the firearms were the product of mistake or accident. It also threw some light on Williams' claim of diminished capacity. (See *People* v. *David* (1939) 12 Cal.2d 639, 646-648 [86 P.2d 811].)

The defendants further point to the dissimilarity of circumstances between the two robberies, and assert that they preclude use of evidence of the earlier offense in proof of the latter. The requirement of similarity is essential when proof of the modus operandi is relied on to establish identity. (See *People* v. *Nazzaro, supra,* 223 Cal.App.2d at p. 379; and *People* v. *Channell, supra,* 136 Cal.App.2d at pp. 113-115.) Once the identity of the perpetrator is established, the requisite degree of similarity may vary with the purpose for which the evidence of the prior offense is offered. The principal discrepancy noted in connection with the circumstances attendant to the two robberies was the time lag in commencing the robbery on the second occasion. The delay does not, as contended by defendants, compel a conclusion that the intent to rob was an afterthought to the homicide, but is readily explainable by a desire to wait until the number of patrons in the bar diminished.

Finally, it should be noted that the testimony was relevant to impeach Carrafa's testimony that he had not seen the shot-

the alleged crime in question in this case, that the defendant had a motive for the commission of the offense charged against him in this action, that the defendant entertained the intent which is a necessary element of the alleged crime for which they are now on trial, and that the defendant was familiar with or possessed the means alleged to have been used in the commission of the crime of which he is accused in this action—and when I use the singular, that also includes the plural—and that the defendant possessed knowledge that might have been useful in or necessary to the commission of the crime for which he is now on trial, and that there existed in the mind of the defendant a plan, scheme, system or design into which fitted the commission of the offense for which they are now on trial.''

gun for two days, and to rebut any inference that he acted in fear of Williams. The evidence of the prior offense was relevant, material and competent.

Although the prosecution could have presented this evidence on its case in chief, its failure to do so did not, under the circumstances of this case, preclude resort to the evidence on rebuttal. From what has been narrated it is clear that the testimony was proper rebuttal on issues raised by Carrafa's testimony. More particularly, however, it appears that the prosecution may well have relied on the fact that Asher was proposing to produce this testimony. The testimony was ultimately produced by the People, instead of by Asher because of the court's ruling on Asher's offer of proof. It is clear, however, that production of the testimony was delayed, with the consent of Carrafa and Williams, so that the issues raised by its presentation could be fully argued to the court. It also appears that Asher's proposed presentation of the witness who gave the damaging testimony was postponed so that Williams could proceed to present his medical witnesses.

In *People* v. *Carter, supra,* the court observed, ''The purpose of the restriction in that section [Pen. Code, § 1093, subd. 4] is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence.'' (48 Cal.2d at p. 753.) The record in this case fails to show that the admission of the evidence in rebuttal, at the instance of the prosecution, occasioned any confusion, magnification or surprise which can be attributed to the prosecution, as distinguished from being caused by the exigencies of a complicated case involving defendants with diverse interests. No reversible error is found in the admission of evidence of the earlier robbery. (See *People* v. *Cavanaugh* (1968) 69 Cal.2d 262, 272 [70 Cal.Rptr. 438, 444 P.2d 110].)

*Prior Convictions*

The indictment charged Carrafa with prior convictions involving a total of three felonies,[13] and set forth two alleged

---

[13]The indictment recites: ''Before the commission of the offense hereinbefore set forth in this indictment, said defendant, VICTOR FRANKLIN CARRAFA, was, in the Superior Court of the State of Connecticut, in and for the County of New Haven, convicted of the felony of Escape and

prior convictions for Asher. Subsequently the allegations of the earlier felony conviction of Asher was stricken and the indictment was amended to show that the later conviction was for multiple offenses.[14]

Asher admitted the conviction, but denied it was a felony. Carrafa at first denied the allegations of his two prior convictions, but on the morning of the trial similarly admitted that he had suffered the convictions but denied that they were felonies. The minutes of the sentencing (see Pen. Code, § 1207) reflect the following: "Each defendant having been convicted of the crime of felony, to-wit: violation of section 187 of the California Penal Code, MURDER, in the first degree, with 1 prior conviction as to Asher, 2 prior convictions as to Carrafa, . . ." Abstracts of judgment (see Pen. Code, § 1213.5) reflect the priors which were charged.

Each defendant contends that the court failed to resolve the issue presented by his plea. (See Pen. Code, § 1158; *People* v. *Eppinger* (1895) 109 Cal. 294, 297-298 [41 P. 1037]; *People* v. *Huffman* (1967) 248 Cal.App.2d 260, 261 [56 Cal.Rptr. 255]; *In re Daniels* (1931) 119 Cal.App. 350, 351 [6 P.2d 549]; *In re Myetta* (1930) 106 Cal.App. 191, 192 [288 P. 800]; and *People* v. *Dueber* (1917) 34 Cal.App. 686, 688-690 [168 P. 578]; and cf. *People* v. *Cooks* (1965) 235 Cal.App.2d 6, 14-15 [44 Cal.Rptr. 819]; *People* v. *Romo* (1962) 200 Cal. App.2d 83, 92-94 [19 Cal.Rptr. 179]; and *People* v. *Yancy* (1961) 196 Cal.App.2d 665, 667-668 [16 Cal.Rptr. 766].)[15]

---

the felony of Theft of A Motor Vehicle, and the judgment of said court against said defendant in said connection was, on or about the 10th day of May, 1960, pronounced and rendered. Before the commission of the offense hereinbefore set forth in this indictment, said defendant, VICTOR FRANKLIN CARRAFA, was, in the Superior Court of the State of Connecticut, in and for the County of New Haven, convicted of the felony of Breaking and entering with Intent to Commit Theft, and the judgment of said court against said defendant in said connection was, on or about the 17th day of October, 1962, pronounced and rendered."

[14]The amendment reads: "Before the commission of the offense hereinbefore set forth in this Indicement [*sic*], said defendant, WILLIAM WALTER ASHER, was in the Circuit Court of the State of Connecticut, in and for the County of New London, convicted of the crimes of TAKING A MOTOR VEHICLE WITHOUT OWNER'S PERMISSION—2 COUNTS—and RECEIVING STOLEN GOODS, felonies, and the judgment of said Court against said defendant in said connection was on or about the 13th day of February, 1963, pronounced and rendered."

[15]Penal Code section 1158 provides: "Whenever the fact of a previous conviction of another offense is charged in an accusatory pleading, and the defendant is found guilty of the offense with which he is charged, the jury, or the judge if a jury trial is waived, must unless the answer of the defendant admits such previous conviction, find whether or not he has suffered such previous conviction. The verdict or finding upon the charge of previous conviction may be: 'We (or I) find the charge of previous

916

At the hearing immediately preceding the commencement of the trial, Carrafa contended that the offenses involved in the multiple conviction of May 10, 1960 (see fn. 13) were not felonies but misdemeanors, and that the conviction of October 17, 1962 (*id.*) could not be a felony conviction because the defendant was in effect treated as a juvenile. The prosecution presented certified copies of records of a Connecticut state reformatory (see Pen. Code, § 969b) which reflected that in connection with the first conviction Carrafa at age 17 on May 10, 1960, was sentenced to Connecticut State Prison for a term of not less than three years nor more than six years for escape, and for a term of one year for theft of a motor vehicle; that in September 1961 he was transferred to the Connecticut State Reformatory; and that he was sentenced to state prison at age 19 on the 1962 offense and not discharged until May 8, 1965.[16] These documents were

conviction true' or 'We (or I) find the charge of previous conviction not true,' according as the jury or the judge find that the defendant has or has not suffered such conviction. If more than one previous conviction is charged a separate finding must be made as to each.''

[16]Section 1-1 of chapter 1, title 1, General Statutes, State of Connecticut, provided in pertinent part, ''Sec. 1-1. Words and phrases. In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly . . . 'Penal institutions' means the State Prison, the State Prison for Women and the jails. 'Correctional institutions' means the Connecticut Reformatory and the Connecticut State Farm for Women.'' [By amendments in 1967, P.A. 152, S. 9 and S. 10, all of the institutions mentioned were denominated ''correctional institutions'']. (I General Statutes of Connecticut (Revision of 1958), as revised to 1966 and 1967 Supplement, § 1-1.)

Section 17.53 of part III of chapter 301, of title 17, defines the jurisdiction of the juvenile court, and provided and provides in part as follows: '' 'Child' means any person under sixteen years of age and any person between the ages of sixteen and eighteen years who has been transferred . . . to the jurisdiction of the juvenile court: . . .'' (IV General Statutes of Connecticut (Revision of 1958) and 1965 Supplement, § 17-53.)

Part IV of chapter 309, title 17, deals with the Connecticut Reformatory. Section 17-389 provided and provides for the original commitment of ''Any male person between the ages of sixteen and twenty-five years who is convicted of an offense for which he may be punished by imprisonment for a shorter period than life, either in the State Prison or in a jail, . . .'' (*Id.*, § 17-389.) Section 17-390 provided and provides as follows: ''Any offender sentenced to the reformatory by the superior court for any offense punishable by imprisonment in the State Prison may be detained in the reformatory not more than five years, unless he has been sentenced for a longer term, in which case he may be held for such longer term. Any offender sentenced to the reformatory for an offense for which the maximum punishment is a sentence to a jail, with or without a fine, may be detained in the reformatory not more than two years.'' (*Id.*, § 17-390.) Section 17-391 provides for sentencing to a reformatory by

offered into evidence by the People, but originally were merely filed with the clerk. Carrafa's attorney stated at the first hearing, ". . . I would ask the Court to decide whether or not each of these three are felonies, and I would ask that that matter be submitted to the Court for the Court's determination as to the law." The question was reviewed at a subsequent hearing in chambers, which preceded the interruption of Asher's case for the purpose of presenting Williams' medical evidence and which also preceded the recall of Carrafa for further cross-examination that had been reserved to the prosecution pending determination of the legal issues. At this hearing it was brought out that under Connecticut law any crime punishable by death or imprisonment for more than one year shall be deemed a felony.[17] His attorney offered to put Carrafa on the stand to tell the court where he served his time, and show that he was certified to the juvenile court or transferred to a reformatory after suffering each of the convictions. He also suggested that the question of Carrafa's representation by counsel at the time of his prior conviction should be explored. The court offered to hear such testimony out of the presence of the jury. The discussion terminated with the following colloquy: " [Carrafa's attorney] : 'My law partner did the research on this . . .' The Court: 'We can go into this when he is here.' [Carrafa's Attorney] : 'I see no reason to further take up the court's time with the matter.' "

inferior courts for a period of detention of "not more than two years" for offenders where the maximum penalty does not exceed a "fine of not more than one thousand dollars or imprisonment in the State Prison for not more than five years or both." (*Id.*, § 17-391.)

Section 18-11 of chapter 320, title 18, provided and provides for the transfer to the Connecticut Reformatory of "Any prisoner under the age of thirty years, who has less than ten years of his minimum sentence remaining to be served . . ." (*Id.*, § 18-11.)

[17]Section 1-1 of chapter 1 of title I, General Statutes of Connecticut provides in pertinent part as follows: "Section 1-1. Words and phrases. In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly . . . Any crime punishable by death or imprisonment for more than one year shall be deemed a felony, and any other crime, unless designated a felony by statute, shall be deemed a misdemeanor." (I General Statutes of Connecticut (Revision of 1958), revised to 1966, § 1-1.)

Escape whether from state prison or county jail is punishable as a felony. (IX General Statutes of Connecticut (Revision of 1958) Title 53, chapter 942, §§ 53-155, 53-157—53-162.) Theft of a motor vehicle and breaking and entering with intent to commit theft are also both so punishable. (*Id.*, § 53-57 and § 53-76.)

Two days later Carrafa was recalled for the resumption of cross-examination by the prosecution. The court out of the presence of the jury again took up the matter of his impeachment by reference to the earlier robbery and by reference to the prior felony convictions. Carrafa's attorney acknowledged that the prosecution had a right to reopen to question his client about a prior felony conviction, but vigorously opposed reference to the other matter.

When the examination was renewed the following occurred: "Q. You have been previously convicted of a felony, haven't you, sir? A. Well, I don't know if we can decide whether it is a felony or not. The Court: That is another matter we haven't quite worked out. [Carrafa's Attorney]: I will stipulate that the Court may make its ruling on the information before it. I have nothing in addition to offer to the Court." Thereupon the court examined the certified records in the file and stated, "It would be my ruling that the man has been previously convicted of a felony." The records were then received in evidence without objection. No attempt was made, either in chambers or open court, to examine Carrafa concerning the proceedings in which he suffered the prior convictions, or concerning the manner in which he served his punishment.

On this record it is clear that the offenses were felonies under the laws of Connecticut, and, as such, were properly used to impeach Carrafa. (Evid. Code, § 788; *People* v. *Theodore* (1953) 121 Cal.App.2d 17, 28-30 [262 P.2d 630]; and see fn. 17, *supra*.) ▆▆▆ Carrafa aptly points out that for the purpose of augmenting his punishment it must be established that the offense of which he was convicted in another jurisdiction was one which could have been punished as a felony under the laws of this state. (Pen. Code, § 3024, subd. (g); and see *People* v. *Hamm* (1956) 145 Cal.App.2d 242, 244 [302 P.2d 345].) ▆▆▆ Here evidence was offered in support of the prior convictions, and the court did not have to depend on the admission of the defendant Carrafa on cross-examination. (Cf. *People* v. *Hamm, supra*.) Escape, theft of a motor vehicle, and breaking and entering with intent to commit theft are all punishable as felonies under the laws of this state. (See Pen. Code, §§ 4530 and 4532; § 484 and Veh. Code, § 10851; and Pen. Code, § 459.)

Carrafa did not contend below, nor has he shown here that there was insufficient evidence to sustain a finding of the truth of the allegations of the prior convictions. His reliance on the principle that the failure of the trier of the fact to find on the issue of the truth of the allegations of the prior felony

convictions serves as an acquittal of such charge (see *People v. Eppinger, supra,* 109 Cal. at pp. 297-298; *People v. Huffman, supra,* 248 Cal.App.2d at p. 261; *In re Daniels, supra,* 119 Cal.App. at p. 351; and *People v. Dueber, supra,* 34 Cal. App. at pp. 688-690) is misplaced.

In this case the issue of the prior convictions was expressly withdrawn from the jury. There was, therefore, no acquittal by the failure of the jury to find on the issues raised by the defendants' qualified pleas. The court, to whom the determination was submitted, did in fact, as reflected by the minutes, make a finding of the truth of the allegations after Carrafa had had a full opportunity to present such facts and argument as he desired. The fact that the finding postdated the verdict of the jury on the principal charge does not invalidate it. In *People v. Romo, supra,* the court analyzed the code provisions as follows: "Penal Code, section 1158, provides that '[w]henever the fact of a previous conviction of another offense is charged in an accusatory pleading, and the defendant is found guilty of the offense with which he is charged, . . . the judge . . . must . . . find whether or not he has suffered such previous conviction . . .' The language of this section, 'whenever . . . defendant is found guilty,' obviously contemplates a finding on the prior by the judge in a nonjury trial *after* his finding of guilt on the main charge, although it does not specify when thereafter it must be made. Cases cited by appellant involving jury verdicts are not here controlling, for the nature of the jury's function and the fact that the jury is discharged upon rendering a verdict (*People v. Ysabel,* 28 Cal.App.2d 259 . . .), require a determination of the issue of a prior, submitted with the main charge, at the same time. Whereas, in a court trial, in which the judge's jurisdiction over all submitted matters ordinarily continues until disposed of, there is no necessity, practical or otherwise, for making a finding on the prior at the time he finds defendant guilty on the main charge. In fact it is a common practice to continue a finding thereon to a time after the disposition of a motion for new trial on the main charge or until the court has before it a probation or presentence report.

"This is not a situation in which the case was reopened for the purpose of proving the prior felony conviction charged, as in *In re Daniels,* 119 Cal.App. 350 . . . , relied upon by appellant herein; but is one in which proof of the charge has already been received at the trial and was before the court at the time it found defendant guilty of violation of section 266h. We do not see how the court's inadvertent failure to act

upon the evidence at the time of judgment on the main charge could be considered a finding that defendant suffered no prior felony conviction, which would be directly contrary to the proven fact and that stated by counsel to the magistrate below, or how it could deprive the court of its right to later make a determination thereon.'' (200 Cal.App.2d at pp. 93-94. See also *People* v. *Cooks, supra,* 235 Cal.App.2d at p. 15; and *People* v. *Yancy, supra,* 196 Cal.App.2d at pp. 667-668.)

With respect to Asher, the record is not as clear as that pertaining to Carrafa. At the initial discussion on the morning of the first day of the trial reference was made to the amended allegations against Asher, and to the fact that a certified copy of a record relating to Asher had been filed with the clerk. Asher's attorney directed the court's attention to the fact that his client had already entered a qualified admission to the amended allegations of the prior conviction, and made a motion to prohibit the district attorney from making any reference to Asher's prior conviction. In support of the motion he offered information received from the clerk of the Circuit Court in Connecticut to the effect that Asher was convicted of only one count of the offense of taking a motor vehicle without the owner's permission. He advised the court that the maximum punishment under that statute was a $1,000 fine or imprisonment for not more than one year, and that it was a misdemeanor.[18] In response to the prosecution's statement that the record also showed a simultaneous conviction of receiving stolen property for which Asher served 22 months, Asher's attorney brought out that Asher, who was born May 25, 1945, was 17 at the time the offenses were committed.[19] He referred to the Connecticut law as establishing that the Connecticut reformatory at which Asher served his time was identical with the California Youth Authority, and

---

[18]Section 14-229 of chapter 248, title 14, General Statutes of Connecticut provided and provides as follows: ''No person shall operate or use, or cause to be operated or used, any motor vehicle unless he has the consent of the owner. Any person who operates or uses, or causes to be operated or used, any motor vehicle without the consent of the owner, or who obtains the consent of the owner to the use of his motor vehicle by false and fraudulent means, statements or representations, shall be fined not more than one thousand dollars or imprisoned not more than one year or both for a first violation; for a second violation shall be imprisoned not more than ten years; and for each subsequent violation shall be imprisoned not more than fifteen years.'' (III General Statutes of Connecticut (Revision of 1958), as revised to 1966, § 14-229.)

[19]The attorney erroneously stated that he was 18 before he was apprehended and sentenced, but the conviction alleged was over two months before his alleged 18th birthday.

that therefore the offense would not have been a felony if committed in the State of California. The discussion concluded on the following note: "The Court: 'Mr. Carman, why can't we get under way? This matter isn't going to come up for some time, and we can see if we can work it out later on.' [Asher's Attorney]: 'It will serve as an introduction to the problem, then. Fine.' " Asher's motion concerning the restraint on the prosecutor was left unresolved.

The matter of Connecticut law came up again in the argument concerning the use of Carrafa's prior conviction for impeachment. The court indicated it had had a discussion on the subject with Asher's attorney and had received authorities from him. The attorney acknowledged that so far as he had been able to discover the place of commitment had no bearing upon whether the offense was a felony or a misdemeanor. It was the length of time that the offender was confined which was determinative.

No reference was made to Asher's prior conviction when he was examined and cross-examined as a witness. Nor was reference made to Asher's prior conviction at the penalty trial. In fact his counsel stated, without being contradicted, ". . . it is incredibly rare for a man with a clear record of no prior offenses to be on trial and be charged in his first offense for first degree murder." Nevertheless, the minutes at the time of sentencing reflect that the court found a prior conviction as to Asher, and the abstract of judgment reflects that on February 13, 1963 he was convicted of two counts of car theft and of receiving stolen property.

Asher complains that there was no evidence before the court to show the fact and nature of his prior conviction. From the foregoing it is clear that all concerned treated the certified copies which had been filed with the court as properly before it. In any event, the defendant admitted the convictions, and the sole question before the court was whether the conviction represented a felony properly chargeable under California law. The objection of Asher that the offense of taking a vehicle without the owner's permission was a misdemeanor went unchallenged. (Cf. Pen. Code, § 499b, and fn. 18, *supra.*) It was, therefore, erroneous to include those charges as a prior felony conviction.

The multiple conviction on February 13, 1963 admittedly included the charge of receiving stolen goods,[20] and

[20]Section 53-65 of chapter 941, title 53, General Statutes, State of Connecticut, provided and provides: "Any person who receives and con-

concededly resulted in confinement in excess of a year. Receiving stolen goods may be a misdemeanor if the value or nature of the property stolen was such as to make its theft a misdemeanor. (See fn. 20, *supra*.) Asher could have been sentenced to the Connecticut reformatory for up to 24 months for a misdemeanor. (See General Statutes, State of Connecticut, §§ 17-390, 17-391, fn. 16, *supra*.) Therefore, it cannot be held as a matter of law that he suffered a prior conviction of a felony. (*In re McVickers* (1946) 29 Cal.2d 264, 277-280 [176 P.2d 40]; *In re Lamey* (1948) 85 Cal.App.2d 284, 289 [193 P.2d 66]; and see *People* v. *Morton* (1953) 41 Cal.2d 536, 539 [261 P.2d 523].) In view of the paucity of the record concerning Asher's prior conviction, and the manner in which the issue was presented to the trial court, the judgment as to Asher should be reversed in part for further hearing on the issue of his prior conviction. (See *People* v. *Morton, supra,* 41 Cal.2d at pp. 541-545.)

In the case of each defendant no issue was raised as to the fact of conviction, or the nature of the crimes involved. The principal issue was whether the age of the defendant and the fact that time was served in a ''reformatory'' defeated the use of the conviction as a felony. There is nothing to show that either defendant was treated as a juvenile offender, or that he was sentenced under special provisions governing youthful offenders.[21] (Cf. *In re Keller* (1965) 232 Cal.App.2d 520, 523-526 [42 Cal.Rptr. 921]; and *People* v. *Lockwood* (1956) 146 Cal.App.2d 189, 192 [303 P.2d 621]; and see Pen. Code, §§ 644 and 2037.) The case is governed by *People* v. *Stein* (1948) 31 Cal.2d 630 [191 P.2d 409], in which the court held that the conviction properly augmented the punishment when the elements of the offense of which the defendant was convicted in the foreign jurisdiction corresponded to the essential elements of the local felony under the statutes in force at the time of the conviction (31 Cal.2d at pp. 635-636). The opinion further ruled that the fact that the defendant at age 16 had been sent to a penal institution for young first offenders, did not relieve him of the burden of the prior conviction. (*Id.,* p. 636.)

ceals any stolen goods or articles, knowing them to be stolen, shall be prosecuted and punished as a principal, although the person who committed the theft is not convicted thereof.'' (IX General Statutes of Connecticut, (Revision of 1958), and 1965 Supplement, § 53-65.) The sections dealing with theft (§ 53-56 through 53-64) reveal offenses which, from the punishment, would be misdemeanors. (See, for example, § 53-63, larceny of property of value of $50 or less.) (*Id.,* §§ 53-56 through 53-64.)

[21]See footnote 16, *supra*.

Carrafa has failed to show any prejudice in the manner in which the nature of his admitted prior convictions was ruled on by the court. He has not pointed out any error which could be rectified upon a rehearing of the question. Finally, it should be noted that the law provides, ''No prisoner imprisoned under a life sentence may be paroled until he has served at least seven calendar years. . . .'' (Pen. Code, § 3046.) There was no allegation or finding of habitual criminality as to either defendant. (See Pen. Code, § 644, erroneously referred to as 664 in the abstracts of judgment.) Nor was there a separate charge or finding that either defendant was armed with a deadly weapon at the time of the commission of the offense or at the time of his arrest. (See Pen. Code, § 3024, subds. (b) and (c) and § 12022; and *People* v. *Williams* (1965) 233 Cal.App.2d 520, 522-523 [43 Cal.Rptr. 704].) Apparently the sole effect of the findings of the prior convictions is to make the minimum term of sentence and imprisonment two years. (Pen. Code, § 3024, subd. (c).) The seven-year minimum of section 3046 renders inapposite statutory directives regarding the minimum terms. (See, *In re Streeter* (1967) 66 Cal.2d 47, 50-52 [56 Cal.Rptr. 824, 423 P.2d 976].)

Asher's judgment should be corrected to reflect the true nature of two of the offenses which were a part of his multiple conviction. No other prejudicial error is found.

*Denial of Asher's Motion for a New Trial*

Defendant Asher contends that he was denied the opportunity to argue his motion for a new trial, and that it was an abuse of discretion to deny the motion in the light of Williams' recantation of his original testimony at the trial on the penalty issue.

In *People* v. *Sarazzawski* (1945) 27 Cal.2d 7 [161 P.2d 934], the court ruled: ''Refusal to permit counsel for the defendant a reasonable opportunity to both prepare and present a motion for a new trial is, under the circumstances shown here, more than a mere error in procedure. It amounts to a deprival of a substantial statutory right and is not covered by the quoted constitutional provision [§ 4½, now § 13 of article VI of the State Constitution].'' (27 Cal.2d at p. 18.) In that case the circumstances upon which the court acted are summarized as follows: ''The above quoted excerpts disclose, not only that counsel for the defendant was misled as to the date upon which she would be required to argue the motion, but also that the trial judge entertained an egregious misconception of his duties and of the relative powers and

functions of the trial court and reviewing court in respect to such a motion.'' (*Id.,* at p. 15.)

The facts of this case show no such refusal to permit Asher's counsel to prepare and present a motion on his behalf. Following the return of verdicts favorable to the defendants at the penalty trial, the defendants were arraigned for judgment. (See, Pen. Code, § 1200.) Thereupon each defendant made a motion for new trial on all of the statutory grounds, and Asher's attorney suggested that he would further attack the proceedings by petition for writ of *coram nobis.* All agreed upon a hearing date one week later. In the course of the discussion of the date for hearing it was brought out that Asher had two attorneys, both of whom were present at the original arraignment.

At the time originally appointed the attorney who conducted the trial for Asher advised the court of the defendant's hospitalization. He withdrew the motion for a writ of *coram nobis,* advised the court that his argument on the motion for new trial would be very short, and agreed to a continuance to the morning calendar on June 12th. The court proceeded to hear arguments on the motion made by Carrafa. It concerned alleged inflammatory comments of the prosecutor and the attorney for Asher, the failure to give instructions and a verdict form on robbery, and the effect of Williams' recantation. Williams' motion was submitted without argument. The court denied each of their motions. Asher's counsel was apparently present during these proceedings because when they concluded he consented to having all pending matters continued to June 14th rather than June 12th. He indicated to the court that if the motion for new trial with respect to Asher was denied at that time, that sentencing could proceed, provided the presentence reports were prepared by that time.

On the 14th, associate counsel for Asher appeared alone and stated, ''. . . I would like to make a motion for a new trial on behalf of Mr. Asher.'' The deputy district attorney stated the motion had already been made by the other co-counsel. The court affirmed that statement. Co-counsel interjected, ''I was under the impression that it hadn't been made.'' The court then stated, ''It was made, and I am prepared to rule on it, and the motion will be denied.'' No objection was voiced by the associate counsel for Asher, and he requested that sentencing be continued to the following Friday, rather than Thursday as suggested by the attorney for Carrafa, and he expressly waived the limitation on the time for sentencing.

At the subsequent hearing, Asher's principal counsel appeared and the following occurred: "The Clerk: '. . . The motions for new trial have been denied, I believe, your Honor, as to all defendants.' The Court: 'Yes.' [Asher's Attorney]: 'Has a motion been made on behalf of Mr. Asher?' [Deputy District Attorney]: 'Yes.' The Clerk: 'Yes, there was a motion for new trial.' [Asher's Attorney]: 'I wasn't sure if it had been made.' The Court: 'It was denied at the last hearing.' "

It is apparent that Asher's two attorneys had failed to get together on the question of arguing the motion for new trial. The failure to request or present argument cannot be attributed to any arbitrary action of the trial court. It had heard argument on other motions in the same case, and in the absence of the presentation of new points was prepared to rule. It lay within the province of counsel appearing on the 14th to request an opportunity to argue if he desired it. If he was misled on the question of whether there had been a full presentation of Asher's motion, it was not solely because of the remarks of the prosecutor and the court, but was also occasioned by his failure to properly consult with principal counsel as to the status of the proceedings. Similarly, the failure of the principal counsel to request argument on June 23d is partially, if not wholly, attributable to his failure to consult with co-counsel as to what had transpired on the 14th.

Furthermore, Asher at this time advances no grounds for a new trial which were not advanced to the court in the argument on behalf of Carrafa. Section 1202 of the Penal Code provides in part: "If the court shall refuse to hear a defendant's motion for a new trial or when made shall neglect to determine such motion before pronouncing judgment or the making of an order granting probation, then the defendant shall be entitled to a new trial." In this case the court did not refuse to hear, in the sense of giving "judicial consideration" to, the motion, nor did it deprive the defendant of a reasonable opportunity to prepare to argue the motion. (See, *People* v. *Sarazzawski, supra,* 27 Cal.2d at pp. 17-18.) The most that can be said is that Asher's attorneys failed to request to orally argue the motion because of a lack of communication between themselves, and a misunderstanding with the court. The case is similar to *People* v. *Murphy* (1962) 207 Cal.App.2d 885 [24 Cal.Rptr. 803]. There "defendant consented to the hearing of his motion for a new trial together with the hearing on the question of probation. He did not call the attention of the court to his motion for new trial or to his

desire to present it on that occasion. He pointed to no reason why it should be granted.'' (207 Cal.App.2d at p. 888.) No ruling at all was made on the motion but the defendant, as in this case, answered ''no legal cause'' when finally arraigned for sentence. The court concluded, ''It is an established rule that a party cannot take advantage of the behavior of the trial court by withholding his objections or motions before the trial court, then asserting his rights on appeal after the verdict has been adverse to him. [Citations.]

''We are convinced that a waiver was effected in the instant case and, after reading the entire evidence, we conclude that no prejudicial error resulted which would indicate that there was a miscarriage of justice, or that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the alleged error. (*People* v. *Watson*, 46 Cal.2d 818. . . .)'' (*Id.*, at p. 890.) So here, Asher must be deemed to have waived argument.

At the penalty trial Williams testified that he did remember the events of the evening in question, that the shooting occurred accidentally when he cocked the gun, and that Asher and Carrafa had nothing to do with the robbery until after Kammeyer was shot. It was for the trial court to determine whether Williams' newly pronounced version of the evening was any more truthful than his original testimony, which had been disbelieved by the jury, that he lacked capacity to act or remember what had occurred. (See *People* v. *Tallmadge* (1896) 114 Cal. 427, 430-432 [46 P. 282]; and Witkin, Cal. Criminal Procedure (1963) § 562, par. (2), pp. 571-572, and cases collected at p. 572.) The trial court was warranted in concluding that the second version was the product of Williams' desire to protect his confederates. No abuse of discretion is found in the denial of Asher's motion for a new trial, or in the manner in which it was heard and determined.

The judgments, with the exception of the finding of Asher's prior conviction of a felony, are affirmed. That part of the judgment finding that Asher suffered a prior felony conviction is reversed, and the cause is remanded for the limited purpose of determining the nature of the offenses for which Asher suffered a prior conviction.

Molinari, P. J., and Elkington, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 6, 1969.